T.C. Memo. 2020-70

UNITED STATES TAX COURT

DANIEL E. LARKIN AND CHRISTINE L. LARKIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6345-14.                         Filed May 28, 2020.

In 2008, 2009, and 2010 Ps, an attorney and a homemaker who
were U.S. nonresident citizens, owned interests in various entities and
real properties in the United States and Europe. Ps' joint Federal
income tax returns for 2008, 2009, and 2010 claimed Schedule A
deductions, Schedule E losses, self-employed health insurance
deductions, and foreign tax credits.

By notice of deficiency issued in 2013, R disallowed some of
Ps' deductions and Schedule E losses, and the foreign tax credits. R
also determined that Ps are liable for accuracy-related penalties and
additions to tax.

<u>Held</u>: Ps failed to substantiate their Schedule A deductions
beyond the amounts that R already allowed.

<u>Held</u>, <u>further</u>, Ps do not qualify as real estate professionals and
are therefore prohibited from deducting their Schedule E rental real
estate losses after the passive activity loss limitation.

**[*2]**     <u>Held</u>, <u>further</u>, Ps are not entitled to the additional self-employed health insurance deductions beyond the amounts that R allowed for 2009 and 2010.

      <u>Held</u>, <u>further</u>, Ps are not entitled to a foreign tax credit carryover to 2009.

      <u>Held</u>, <u>further</u>, Ps are liable for the I.R.C. sec. 6662(a) accuracy-related penalties for 2009 and 2010 and are liable for the addition to tax under I.R.C. sec. 6651(a)(1) for 2008, 2009, and 2010.

<u>Gerald Edward Kubasiak</u>, <u>Steven J. Rotunno</u>, and <u>Daniel F. Cullen</u>, for petitioners.

<u>Mayah Solh-Cade</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  The Internal Revenue Service ("IRS") issued to petitioners, Daniel E. Larkin and Christine L. Larkin, a statutory notice of deficiency ("SNOD") pursuant to section 6212[1] on November 15, 2013, for the Larkins' 2008, 2009, and 2010 tax years.  This case arises from the Larkins'

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.; "the Code"), as amended as in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar amounts are rounded to the nearest dollar.

**[*3]** timely petition pursuant to section 6213 for redetermination of the deficiencies, additions to tax, and accuracy-related penalties[2] determined by the IRS. After stipulations and concessions by the parties, the issues for decision are:

(1) whether the Larkins are entitled to additional itemized deductions claimed on Schedule A, "Itemized Deductions", for the years at issue (we hold that they are not);

(2) whether the Larkins are entitled to a rental real estate loss deduction claimed on Schedule E, "Supplemental Income and Loss", after passive limitation, for the years at issue (we hold that they are not);

(3) whether the Larkins are entitled to additional self-employed health insurance deductions for tax years 2009 and 2010 (we hold that they are not);

(4) whether the Larkins are entitled to a foreign tax credit ("FTC") (or to an FTC carryover) for 2009 (we hold that they are not);

(5) whether the Larkins are liable for additions to tax pursuant to section 6651(a)(1) for the years at issue (we hold that they are); and

---

[2]The SNOD determined the accuracy-related penalties on alternative grounds; but the Commissioner has conceded all such grounds except negligence under section 6662(a) and (b)(1), so we do not further discuss the alternative grounds.

**[\*4]**    (6)  whether the Larkins are liable for accuracy-related penalties pursuant to section 6662(a) for the years at issue (we hold that they are not liable for 2008 but that they are liable for 2009 and 2010).

FINDINGS OF FACT

At the time they filed their petition, Mr. and Mrs. Larkin resided in Surrey, England, in the United Kingdom ("U.K.").  The Larkins were married U.S. citizens and resided in England at all times during the relevant years.

Daniel E. Larkin

Mr. Larkin is a highly educated attorney with more than 20 years' experience dealing in a variety of complex transactional matters.  For all relevant years, Mr. Larkin was a partner at Squire, Sanders & Dempsey, LLP ("SSD"), which was based in Cleveland, Ohio.  He previously worked for PricewaterhouseCoopers LLP and at the time of trial was employed by another multinational law firm.  Mr. Larkin testified that he advises institutional clients on legal and financial matters.

Christine L. Larkin

Mrs. Larkin is a "homemaker", as the Larkins reported on their income tax returns.  The Larkins claim that Mrs. Larkin is a real estate professional (for the purposes of qualifying for Schedule E rental real estate deductions), but we find

[*5] that in the years at issue Mrs. Larkin did not spend as much as 750 hours per year in real property trades or businesses.

Mr. Larkin's U.K. income

In each of the years at issue, Mr. Larkin received from SSD guaranteed payments and a distributive share of ordinary income, which constituted most of the Larkins' income. We are unable to find that, as of 2008, Mr. Larkin had paid U.K. income tax in prior years for which an FTC had not been allowed that might be carried over into the years at issue.

Home mortgage interest

In 2001 the Larkins purchased a plot of land in the outskirts of London. They divided it into two lots and built their residence on one of them. (The second lot is discussed below.) In the years at issue, the Larkins still owned that house in England and paid interest on a mortgage loan secured by that house, for which the balance due in 2008 was $2,432,152. In 2008 they paid mortgage interest of $24,270 (an amount reported by third-party payees and allowed by the IRS as a Schedule A deduction). On their 2009 return the Larkins reported mortgage interest of $17,000, which the IRS allowed as a Schedule A deduction along with an additional $7,223, totaling $24,223 (presumably reported by third-party payees). Despite the Larkins' contentions that they could deduct additional

**[*6]** mortgage interest paid in 2008, 2009 and 2010, the amounts for 2008 and 2009 are not at issue.  We find that they have not substantiated additional mortgage interest payments in 2010.

Real estate interests

The Larkins assert that during the relevant period, they maintained ownership interests in four properties as part of a rental real estate activity:

Denton Homes lot.  The second of the two lots outside London that the Larkins acquired in 2001 is referred to as the "Denton Homes lot".  They sold it to a developer in 2007.  We find that in the years at issue they did not retain an interest in, nor conduct any substantial activity in connection with, the Denton Homes lot.

Belmont property.  In 2007 the Larkins purchased a condominium apartment in Chicago that they refer to as "the Belmont property".  The Larkins' daughters lived at the Belmont property during at least some part of the years at issue.  We do not find that any paying tenants lived at the Belmont property during these years or that the Larkins owned any interest in the Belmont property after 2008.

France property.  The Larkins allege that during the years at issue they co-owned a property in France along with Mrs. Larkin's sister and brother that they

**[\*7]** periodically rented to third parties as a large vacation home. In the absence of proof, we find that they did not establish that they owned such a property.

Lake house. The Larkins consider a house in Wisconsin ("the lake house") to be their "second home". They purchased the lake house along with another couple, and the two couples own their interests indirectly through Treetops LLC, an entity that they formed to purchase and hold the lake house, the sole asset of Treetops LLC. The Larkins owned their share of Treetops LLC through another entity, Larmodt LLC. During 2009 and 2010, the Larkins each owned 35%--totaling 70%--of Larmodt LLC,[3] and two of the Larkins' daughters each owned 10% of Larmodt LLC. (The evidence does not show who owned the remaining 10% or whether that owner was an individual.) In 2008 Larmodt LLC owned 50% of Treetops LLC, but we have no evidence as to the Larkins' precise equity

---

[3]The evidence of the ownership of Larmodt LLC is its Schedules K-1, "Partner's Share of Income, Deductions, Credits, etc.", for 2009 and 2010, though the record does not contain Schedules K-1 sufficient to account for 100% of Larmodt LLC's ownership for either of these years. No 2008 Schedules K-1 for Larmodt LLC are in evidence. (In their prior case, "[t]he record does not further identify Larmodt, L.L.C., or its owners", Larkin v. Commissioner ("Larkin I"), T.C. Memo. 2017-54, at *26 n.19, aff'd in part, rev'd in part, Larkin v. Commissioner ("Larkin II"), No. 17-1252, 2020 WL 2301462 (D.C. Cir. Apr. 21, 2020), but we decide this case on its own evidence.)

[*8] interest in Larmodt LLC.[4]  We find that the lake house was not rented out during any of the years at issue.

Investment interest

In the SNOD the IRS conceded that the Larkins paid deductible investment interest in the years at issue--$6,310 in 2008, $5,278 in 2009, and $6,150 in 2010-- and the parties have stipulated that "the Schedule A--Investment Interest already

---

[4]The evidence of the ownership of Treetops LLC is the Schedule K-1 for 2008 issued by Treetops LLC to Larmodt LLC reflecting a 50% equity interest. (In Larkin I we found that in the years 2003-06 the Larkins' equity interest in Treetops LLC was 65%, see Larkin I, at *8-*9, but our opinion in this case involves different years and is based on different evidence.)  In Larkin I there was no evidence about the ownership of Larmodt LLC or the assets it owned, and we determined that Treetops LLC was a "small partnership" within the meaning of section 6231(a)(1)(B) because the record established that it had at most two partners (each married couple treated as a single partner).  Therefore items on the Schedules K-1 for Treetops LLC in Larkin I were subject to redetermination in that case rather than requiring partnership-level proceedings under the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA").  See id. at *63.  For the years now at issue it appears that Treetops LLC was not a "small partnership" within the meaning of section 6231(a)(1)(B) because one of its owners, Larmodt LLC, was not "an individual (other than a nonresident alien), a C corporation, or an estate of a deceased partner."  The evidence is insufficient to determine whether Larmodt LLC itself would be subject to TEFRA; it shows that 90% of Larmodt LLC was owned by individuals in the Larkin family, but for all we know the owner of the remaining 10% was a nonresident alien, a partnership, or an LLC, in which case Larmodt LLC, too, was not a "small partnership" but was instead subject to TEFRA.  We accept the status and ownership of Larmodt LLC and Treetops LLC as shown by the Schedules K-1; we assume correct the Larkins' allegations about ownership of the LLCs where Schedules K-1 are missing; and we do not attempt to redetermine any partnership items in this proceeding.

[*9] allowed on the notice of deficiency, in the amounts of $5,278 and $6,150, for tax years 2009 and 2010, respectively, was from Larmodt, LLC". We do not disturb the IRS's concessions in the SNOD. We find that the Larkins have not substantiated additional amounts of investment interest that they allege they paid to four other entities in 2009 and 2010. (Investment interest is not at issue for 2008. See infra part I.B.1.)

State income tax and personal property tax

Mr. Larkin's law firm SSD withheld and paid over State and local income tax for Mr. Larkin in amounts no greater than $7,136 for 2008, $6,015 for 2010, and $2,305 for 2010. The Larkins also paid $300 in personal property tax in 2009.

Real estate tax

For 2009 and 2010 the Larkins did not prove that they paid--and we find that they did not pay--any additional amounts of income tax or property tax. (Real estate tax is not at issue for 2008. See infra part I.B.1.)

Self-employed health insurance

The Larkins purchased health insurance for themselves in 2008 (which is not in dispute), 2009, and 2010. For their health insurance premiums, the parties have stipulated that "[p]etitioners are entitled to Self-Employed Health Insurance deductions limited to the amount of $15,511 for tax year 2008." For the

[*10] subsequent years, we find that the Larkins paid no more than $7,178 in 2009 and $2,192 in 2010.

Tax returns

Mr. Larkin himself prepared petitioners' joint Forms 1040, "U.S. Individual Income Tax Return", for the years at issue.

### 2008 Form 1040

The Larkins requested and were granted an extension to file their 2008 tax return on or before December 15, 2009, but failed to file the 2008 return by the extended deadline. The IRS received third-party information regarding the Larkins' income for 2008 and filed a substitute for return ("SFR") on June 14, 2011. (The 2008 SFR is not in the record; however, the Larkins never contested its existence or validity.) The adjustments in the SNOD for 2008 are based in part on the SFR.

An FTC was claimed on the Form 1040 that Mr. Larkin prepared (but did not file) for 2008. (No FTC is at issue for 2008, see infra part I.B.3, but the Larkins' 2008 reporting is relevant to their claim of an FTC carryover into 2009.) The Form 1116, "Foreign Tax Credit", for 2008 showed that the Larkins' claim of an FTC of $16,785, of which $578 was credited against their tax for 2008, was

**[*11]** based on a "carryback or carryover", but a detailed computation of the carried FTC was not attached to the form.

Mr. Larkin prepared a Form 1040 for 2008 and submitted it to a revenue agent on August 23, 2012. It appears that the Commissioner considered some of the information from that Form 1040 in preparing the SNOD. However, we find (as the Commissioner contends) that the Larkins did not file a return for 2008. See infra part VII.A.

2009 return

The Larkins requested and were granted an extension to file their 2009 tax return on or before October 15, 2010. The Larkins filed their 2009 tax return more than a year late on November 8, 2011.

The Larkins claimed an FTC sufficient to cover their U.S. income tax due on their return for 2009. Mr. Larkin attached to the Form 1040 a Form 1116, claiming an FTC "carryback or carryover" of $16,307, of which $4,014 was applied against their tax for 2009. But a detailed computation of the carried FTC was not attached.

The IRS found that the Larkins' self-prepared 2009 return contained mathematical errors and claims of credits exceeding those allowed by the Code. The IRS adjusted the totals of income and tax as reported on the returns, resulting

[*12] in a correct adjusted gross income of $160,869 and taxable income of $54,471, assessed tax of zero after application of a reported foreign tax credit, and issued the Larkins a refund of $140 for tax year 2009.

2010 return

The Larkins requested and were granted an extension to file their 2010 tax return on or before October 15, 2011, which was a Saturday, so that the return would have been timely if filed Monday, October 17, 2011. The Larkins did not meet this deadline but filed their 2010 return almost a month late on November 16, 2011.

The IRS found that the Larkins' self-prepared 2010 return contained mathematical errors and claims of credits exceeding those allowed by the Code. The IRS adjusted the totals of income and tax as reported on the return, resulting in an adjusted gross income of $64,955, taxable income of zero, and an overpayment of tax of $2,356 for 2010.

The Larkins' record-keeping

Mr. Larkin took responsibility for the Larkins' tax return preparation, which included consulting with tax professionals at his various places of work--in this case, SSD. His testimony suggested that he could back up the positions taken on the Larkins' returns by, inter alia, tracing alleged investment interest to specific

[*13] eligible investments proffered in his exhibits and pointing to specific items in the proffered exhibits, such as the Schedules K-1, which would supposedly explain the figures reported on the returns. However, when pressed, he was unable to explain reporting positions he had taken on the returns. Many of the exhibits the Larkins have offered are standard tax forms that are used to prepare income tax returns (i.e., information returns such as the Schedules K-1 for their interests in various closely held entities), and yet many of these documents are incomplete and fail to fully support the extent of the Larkins' claimed ownership in a given year or the continuity of ownership over the course of the years at issue. Records that the Larkins have submitted to substantiate payment of expenses for which they claim deductions, such as credit card statements, do not segregate deductible expenses from those that are not deductible. Despite the Larkins' assertion that they engaged in significant rental real estate activity, they have submitted not one document evidencing a contract for rental or lease of any of their properties to a third party. The only lease the Larkins offered into evidence showed Mr. Larkin as lessee and was admitted in support of their claim for a housing exclusion. Overall, there is a dearth of records to support the Larkins' disputed return positions.

[*14] The Larkins imply nonetheless that such records exist, asserting that "they were never submitted to the IRS because they were not requested". This explanation is not a valid excuse for their failure to substantiate their deductible expenses at trial, as we explain below in part I.C.2.

SNOD and petition

The IRS conducted an examination for the Larkins' years 2008, 2009, and 2010. Revenue Agent Sabrina Thorne determined to disallow the deductions discussed herein. In addition, she initially determined that accuracy-related penalties should be asserted "under IRC 6662(c)", i.e., for "negligence"; and her immediate supervisor approved her penalty determination in writing on January 15, 2013. Ten months later the IRS issued the SNOD on November 15, 2013, disallowing deductions and determining additions to tax and accuracy-related penalties for all years at issue.

Mr. and Mrs. Larkin timely filed their petition on March 19, 2014.

Pretrial proceedings

Trial was scheduled for January 5, 2015. At the Larkins' request the case was continued, and trial was rescheduled for June 1, 2015. The Larkins again requested a continuance, their request was granted, and trial was rescheduled for October 19, 2015--nine months after the originally scheduled trial date in January

**[*15]** 2015, 17 months after the Larkins filed their petition in March 2014, 23 months after the issuance of the SNOD in November 2013, and almost four years after the Larkins' filing of the return for the latest year at issue (i.e., the 2010 return filed in November 2011).

We issued our standing pretrial order on May 19, 2015. That order required each of the parties to file a pretrial memorandum. The Larkins did not do so, but the Commissioner did.

On October 13, 2015, the Court held a telephone conference with respondent's counsel and the Larkins (who at that time represented themselves). During that conference Mr. Larkin requested a third continuance. The Court pointed out to him that he was making that request less than 30 days before the trial session, which under Rule 133 is presumptively dilatory. The Court stated that it saw no grounds warranting a continuance and denied the request.

The Larkins did not appear personally at the calendar call on October 19, 2015, but sent a newly retained attorney (who said he was not available to try the case that week) to appear for them and move for another continuance. We denied the continuance and scheduled the case for trial the next day, on October 20, 2015.

At the Larkins' counsel's request we recalled the case in the afternoon of October 19, 2015. The new counsel who had appeared that morning moved to

**[*16]** withdraw from the case (a motion we granted), and newer counsel filed an entry of appearance and again moved for a continuance. We denied the motion and tried the case as scheduled.

The Larkins' motions to supplement the record

At the conclusion of trial, petitioners' counsel requested that the Court leave the trial record open for 30 to 45 days so that the Larkins could add to the trial record additional exhibits they hoped to be able to find. The Court stated:

> I'm going to deny your very broad motion to leave the record open so that you can bring in anything that relates to any deduction already at issue in the case.
>
> However, I am going to do so without prejudice to your renewing that motion when you have specific documents that you wish to offer. * * * You are free to file whatever motion you wish. I will tell you that a motion filed after 45 days [i.e., after December 4, 2015], when Respondent['s counsel] begins to work on her brief and invests time in it, and then you would be changing the ground underneath her, that would not be just.

On December 2, 2015, the Larkins moved to supplement the record with additional documents, and the Commissioner did not object. The Court deferred the parties' filing of post-trial briefs so that they could attempt additional stipulations, which they filed June 6 and July 27, 2016, and which rendered moot the Larkins' motion to supplement the record.

**[*17]** The Court directed the parties to propose a briefing schedule as to the remaining issues, but on August 3, 2016--more than nine months after the conclusion of the trial--the Larkins filed a second motion to supplement the trial record, to which the Commissioner objected; but at the Court's instruction the parties attempted and were able to file a second supplemental stipulation of facts that rendered moot the Larkins' second motion (to the extent they did not concede the motion).  The Court denied as moot or as conceded the two motions to supplement, and the Court then set a briefing schedule, calling for an opening brief by the Larkins, an answering brief by the Commissioner, and a reply brief by the Larkins.

However, when the Larkins filed their reply brief on April 28, 2017, they also filed on that same date--more than 18 months after the conclusion of trial--a third motion to supplement the record with proposed exhibits (not admitted at trial or thereafter) that they cited in their reply brief.  The Commissioner objected to the third motion and moved to strike from the Larkins' reply brief all references to the proposed new exhibits. For the reasons explained below in part I.D, we will deny the Larkins' third motion to supplement the record and will grant the Commissioner's motion to strike.

**[*18]** <u>Graev v. Commissioner</u>

On December 20, 2017, after the parties had filed their briefs in this case, this Court issued its Opinion in <u>Graev v. Commissioner</u>, 149 T.C. 485 (2017), <u>supplementing and overruling in part</u> 147 T.C. 460 (2016), addressing the effect of section 6751(b)(1) on penalty liabilities. By order of February 8, 2018, we set in motion a procedure for addressing the application of <u>Graev</u> to this case, and that process concluded with the parties' filing on March 22, 2018, a supplemental stipulation that sets out the facts stated above concerning supervisory approval of penalties, and their filing supplemental briefs in April and May 2018.

<u>Related cases</u>

Before filing their petition in this case, the Larkins had commenced two other cases (docket Nos. 14886-08 and 19940-09) that concern their taxable years 2003 through 2006. On April 3, 2017, during the time when the Larkins were preparing to file their reply brief in this case, the Court issued its opinion in those earlier consolidated cases--<u>Larkin v. Commissioner</u> ("<u>Larkin I</u>"), T.C. Memo. 2017-54. On October 31, 2017, the Larkins filed notices of appeal in those cases in the U.S. Court of Appeals for the District of Columbia Circuit, Docket No. 17-1252, which issued its unpublished opinion on April 21, 2020, ordering <u>Larkin I</u> affirmed in part and (as to issues the Commissioner had conceded)

**[*19]** vacated and remanded in part. <u>Larkin v. Commissioner</u> ("<u>Larkin II</u>"), No. 17-1252, 2020 WL 2301462 (Apr. 21, 2020).

Some issues for the years 2003 through 2006 in those related cases are similar to some of the issues in this case for the years 2008 through 2010. However, neither party has raised the issue of collateral estoppel,[5] <u>see</u> <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 598-599 (1948), which is a "special matter" that Rule 39 would require to be pleaded; and we decide the disputed issues in this case on the basis of the evidence admitted in this case.

Issues in dispute

After stipulations and concessions by the parties, the following issues remain in dispute:[6]

---

[5]The pendency of the appeal in <u>Larkin I</u> while this case was being briefed would not have precluded the invocation of collateral estoppel. <u>See</u> <u>Martin v. Malhoyt</u>, 830 F.2d 237, 264 (D.C. Cir. 1987) (noting that for purposes of applying the doctrine of collateral estoppel, the pendency of an appeal does not automatically diminish the preclusive effects of a prior adjudication).

[6]Pursuant to Rule 91(a) the parties stipulated the inclusion of $5 of taxable interest for 2009; however, it is clear to the Court that the parties intended to stipulate the inclusion of $5 of taxable interest for 2010, the year indicated on the SNOD for that adjustment.

**[*20]** <u>Schedule A itemized deductions</u>

In Schedules A submitted with their 2009 and 2010 tax returns (and with their untimely Form 1040 for 2008), the Larkins originally claimed deductions of certain amounts. In the SNOD the IRS allowed Schedule A deductions of lesser amounts. In their briefs[7] the Larkins argue that they are entitled to additional Schedule A deductions as follows for 2008, 2009, and 2010:

| Year | Mortgage interest | Investment interest | Taxes |
|------|-------------------|---------------------|-------|
| 2008 | $28,667 | $4,023 | $3,465 |
| 2009 | -0- | 4,882 | 6,015 |
| 2010 | 6,673 | 9,311 | 5,400 |

For the reasons explained below in part I.B.1, Schedule A deductions for 2008 are not properly at issue. The Commissioner contends that the Larkins are entitled to no additional Schedule A deductions.

---

[7]Some of the amounts of deductions claimed in the Larkins' opening brief are increased in their reply brief, but there are inconsistencies in the reply brief where they appear to have copied smaller amounts from their opening brief. We assume that the Larkins argue for the amounts in the reply brief, except that we assume they claim for 2008 the larger amount of mortgage interest stated in their opening brief, though their reply brief argues for "at least" a smaller amount.

**[\*21]** Schedule E real estate expenses

As to the four property interests described above, the Larkins argue that they are entitled to deduct Schedule E rental real estate losses, not reduced by the passive loss limitation of section 469, in the full amounts that they reported on their Forms 1040 and that were disallowed in the SNOD--i.e., $35,591 for 2008, $42,810 for 2009, and $28,240 for 2010.  For the reasons explained below in part I.B.2, Schedule E deductions for 2008 are not properly at issue.  The Commissioner contends that the Larkins' loss deductions are foreclosed by section 469.

Self-employed health insurance

The Larkins claim they are entitled to deductions for self-employed health insurance of $15,700 for 2009 and $12,700 for 2010.  The Commissioner conceded that the Larkins substantiated deductions of $7,178 for 2009 and $2,192 for 2010, and the differences between the claimed amounts and the conceded amounts remain at issue.

Foreign tax credit

In the SNOD the Commissioner disallowed the FTC claimed for 2009.  The Larkins disputed that disallowance in their petition.  For the reasons explained below in part I.B.3, an FTC for 2008 is not properly at issue.

**[*22]** <u>Penalties and additions to tax</u>

For each of the years at issue, the Commissioner contends that petitioners are liable for an accuracy-related penalty under section 6662(a) and for an addition to tax under section 6651(a)(1) for failure to timely file their return.

OPINION

I.     <u>General principles</u>

A.     <u>Abandoned issues</u>

The Larkins' opening brief challenges some (but not all) of the IRS's determinations in the SNOD.  We consider any issue or argument that the Larkins did not advance on brief as having been abandoned.  See <u>Mendes v. Commissioner</u>, 121 T.C. 308, 312-313 (2003); <u>Nicklaus v. Commissioner</u>, 117 T.C. 117, 120 n.4 (2001); <u>Rybak v. Commissioner</u>, 91 T.C. 524, 566 n.19 (1988). We decide only the issues that the Larkins pleaded, addressed on brief, and did not concede.

B.     <u>Issues not pleaded or tried by consent for 2008</u>

A petition for redetermination of a deficiency determined in an SNOD "shall be complete, so as to enable ascertainment of the issues intended to be presented."  Rule 34(a)(1).  The petition shall, among other things, contain "[c]lear and concise assignments of each and every error which the petitioner alleges to

[*23] have been committed by the Commissioner in the determination of the deficiency * * * . * * * Any issue not raised in the assignments of error shall be deemed to be conceded." Rule 34(b)(4); see also Foley Mach. Co. v. Commissioner, 91 T.C. 434, 441 (1988) (holding that the Court does not consider issues which are not raised by the pleadings). In certain circumstances, an issue not raised by the pleadings may be "tried by express or implied consent of the parties, * * * [and] treated in all respects as if they had been raised in the pleadings." Rule 41(b)(1). But we have held that when a party is not aware of an issue at trial, he cannot be held to have expressly or impliedly consented to the trial of that issue, as required for application of Rule 41(b). See Markwardt v. Commissioner, 64 T.C. 989, 998 (1975).

In their reply brief, the Larkins attempt to raise new issues related to 2008, but we do not entertain them because we find that none of these issues was properly pleaded or tried by consent.

### 1. Schedule A deductions for 2008

We hold that Schedule A deductions--mortgage interest, investment interest, and State and local tax deductions--for 2008 are not at issue. The petition disputed the disallowance of investment interest and real estate tax deductions for

[*24] 2009 and 2010 and disputed the disallowance of mortgage interest for 2010 but was silent as to any Schedule A deductions for 2008.

The Commissioner's pretrial memorandum reflected his understanding that itemized deductions were in dispute (as issue "8") "for tax years 2009 and 2010" and was silent as to 2008. (As we have noted, the Larkins did not file the required pretrial memorandum.) At the beginning of trial the Court undertook to confirm explicitly the issues to be decided. The Commissioner gave his list of issues, which were fewer than the list in his pretrial memorandum but which did include his issue "8" (i.e., itemized deductions for 2009 and 2010). In response to the Court's query, petitioner's counsel assented to the Commissioner's list and agreed that there were "[n]o extra issues raised by either party." The Larkins gave no testimony as to deductions for investment interest or mortgage interest for 2008. The only testimony the Larkins offered regarding real estate taxes for 2008 pertained to their residence in England, and Mr. Larkin's discussion of those taxes was to distinguish them from the other items offered in the Exhibit 5 that he proffered in support of his housing exclusion (an issue later conceded by the Commissioner). The Larkins' first contention that they should be allowed additional Schedule A deductions for 2008 (other than those allowed in the SNOD) was in their post-trial brief. For substantiation of real estate taxes and

[*25] investment interest, the brief cites only the 2008 Schedule K-1 for Treetops LLC, but at trial this document was not proffered to substantiate investment interest or real estate tax deductions. Rather, Mr. Larkin's only testimony about this Schedule K-1 was nonspecific. He testified generally about the process of preparing the Schedules K-1 for Larmodt LLC and Treetops LLC during the years at issue (e.g., as part of a narrative answer regarding the real estate activities in which he and his wife participated); about the fact that the distributive shares of items from Treetops LLC that petitioners claimed were "rolled up through the Larmodt LLC K-1" before being reported on their individual tax return; and about the "fact" that "every year * * * [they] would attach a Treetops [LLC Schedule] K-1 along with a Larmodt [LLC Schedule] K-1"--an assertion not otherwise supported by the record. The post-trial contentions as to Schedule A deductions for 2008 were neither pleaded nor tried by consent, so they are not properly in the case.

### 2. Schedule E deductions for 2008

We hold that losses allegedly sustained for rental real estate activity that were reported on the Larkins' Schedule E for 2008 are not properly at issue. As we have noted, the Larkins did not file an income tax return for 2008, but they did submit a Form 1040 (prepared by Mr. Larkin) to a revenue agent during an audit

**[*26]** and before the issuance of the SNOD, which was evidently prepared using information considered in audit from that Form 1040. The petition that the Larkins filed after receiving the SNOD disputed the "proposed reductions to [Schedule E] losses claimed in 2009 and 2010", but it raised no issues regarding and made no reference to Schedule E losses for 2008.

The Commissioner's pretrial memorandum reflected his understanding that Schedule E rental real estate losses were in dispute (as issue "9") "for tax years 2009 and 2010" and was silent as to 2008. Again, the Larkins did not file a pretrial memorandum; and at trial the Larkins confirmed, through counsel, that there were no "extra issues raised by either party."

At trial Mr. Larkin testified (consistent with the Form 1040 he prepared) that the only property for which he reported rental real estate activity on Schedule E for 2008 was the Belmont property; and he gave this testimony as part of his explanation for why he had taken a "capital write-down" for the property on Schedule D, "Capital Gains and Losses", after changing the manner in which he reported his activity on that property from Schedule C, "Profit or Loss From Business", of his return for 2007 to Schedule E for 2008. This testimony did not raise the issue of Schedule E losses for 2008, and the issue was not tried by

[*27] consent.  Again, the first time the Larkins raised Schedule E losses for 2008 was in their post-trial brief--too late to try the issue in this case.

   3.   FTC for 2008

An FTC is properly at issue only for 2009, and not for 2008.  The only FTC adjustment in the SNOD was for 2009.  The only FTC contention in the petition-- and thus the only such claim in the pleadings in this case--was:  "The Service proposes to disallow FTC claimed for 2009.  This represents carryforward FTC".

The Commissioner's pretrial memorandum reflected his understanding that the only FTC issue in this case (issue "12") is "[w]hether the Larkins are entitled to a Foreign Tax Credit in the amount of $16,207 for tax year 2009"; the Larkins did not file the required pretrial memorandum; and at trial they confirmed, through counsel, that there were "no extra issues raised by either party."  During Mr. Larkin's testimony, the Court asked petitioners' counsel:  "Is the dispute about foreign tax credit for 2009 only?"  Counsel replied:  "Yes, Your Honor."  To the same effect, the Larkins' first post-trial filing--a motion to supplement the record-- stated:  "This issue is whether Petitioners are entitled to a foreign tax credit for the payment of taxes to the United Kingdom in 2009."

In their post-trial briefs, however, the Larkins attempted to change course:  Their opening brief purported to add a contention as to an FTC for 2008, but we

**[\*28]** will not entertain this contention since it conflicts with their statements at trial and the pleadings upon which the case is based.

The Larkins' opening brief was equivocal about whether their FTC claim was for U.K. taxes paid in the years at issue (we find that no such taxes were paid) or arose instead from carryovers from prior years. But the Larkins' reply brief stated that "[t]he issue is not if Petitioners had any income or if they paid any foreign taxes during the years 2008-2010, the issue is whether they properly used a foreign tax credit carryover from prior years."

We therefore address the FTC only as to 2009 and only as to carryovers from pre-petition years--i.e., in the words of the petition, "FTC claimed for 2009" as "carryforward FTC"--and we treat as conceded any other FTC claims.

C.    Burden of proof

1.    General rule

The IRS's determinations are presumed correct, and taxpayers generally bear the burden to prove their entitlement to any deductions they claim. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Taxpayers must satisfy the specific requirements for any deduction claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

**[\*29]** The taxpayer must carry his burden of proof with evidence offered at trial, to which his brief should refer.[8]  Where the evidence presented at trial is insufficient to support a finding that a particular expense is deductible, we must sustain the IRS's determinations and disallow the deduction.

### 2. Record-keeping

Section 6001 requires that "[e]very person liable for any tax imposed by this title, or for the collection thereof, <u>shall keep such records</u>, render such statements, make such returns, and comply with such rules and regulations <u>as the Secretary may from time to time prescribe</u>."  (Emphasis added.)  A taxpayer is thus required to keep sufficient records to substantiate his gross income, deductions, credits, and other tax attributes.  <u>See also</u> 26 C.F.R. sec. 1.6001-1(a), Income Tax Regs.[9]

---

[8] <u>See</u> Rule 151(e)(3) ("All briefs * * * shall contain * * * [p]roposed findings of fact * * * based on the evidence * * *.  * * * [T]here shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement."); <u>Adeyemo v. Commissioner</u>, T.C. Memo. 2014-1, at \*28; <u>D'Errico v. Commissioner</u>, T.C. Memo. 2012-149, slip op. at 19 ("We need not (and will not) undertake the work of sorting through every piece of evidence petitioners have provided in an attempt to find support for petitioners' ultimate legal positions taken in this case").

[9] <u>See also</u> 26 C.F.R. sec. 1.446-1(a)(4), Income Tax Regs. ("Each taxpayer is required to make a return of his taxable income for each taxable year and must maintain such accounting records as will enable him to file a correct return.  See section 6001 and the regulations thereunder.  Accounting records include the taxpayer's regular books of account and such other records and data as may be

(continued...)

[*30] The regulations implementing that statute include 26 C.F.R. section 1.6001-1(a), Income Tax Regs., which provides: "[A]ny person required to file a return of information with respect to income, shall keep such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax".

Taxpayers are required to retain their books and records as long as they may become material:

> Retention of records.--The books or records required by this section shall be kept at all times available for inspection by authorized internal revenue officers or employees, and shall be retained so long as the contents thereof may become material in the administration of any internal revenue law. [26 C.F.R. sec. 1.6001-1(e), Income Tax Regs.]

### 3.    The Cohan rule

The Code's substantiation rules are subject to some flexibility. When a taxpayer adequately establishes that a deductible expense was paid or incurred but does not establish the precise amount, the Court may in some instances estimate the allowable deduction, bearing heavily against the taxpayer whose inexactitude

---

[9](...continued)
necessary to support the entries on his books of account and on his return, as for example, a reconciliation of any differences between such books and his return").

**[\*31]** is of his own making.  <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930).  There must, however, be sufficient evidence in the record to provide a basis upon which an estimate may be made and to permit the Court to conclude that a deductible expense, rather than a nondeductible personal expense, was incurred in at least the amount allowed.  <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 743 (1985).  We must have some basis on which such an estimate may be made.  <u>Id.</u> (citing <u>Williams v. United States</u>, 245 F.2d 559 (5th Cir. 1957)).

    4.    <u>Witness credibility</u>

At trial Mr. Larkin was the sole witness for petitioners.  We observe the candor, sincerity, and demeanor of a witness in order to evaluate his testimony.  The mere fact that Mr. Larkin's testimony was unopposed does not mean that we will make findings consistent with it.  We will not accept the testimony of a witness at face value to the extent it is implausible or not credible in view of the totality of the surrounding circumstances.  <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 84 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

In general, Mr. Larkin's testimony on contested matters was not convincing.  Accordingly, we generally do not rely on his testimony to support the Larkins' positions, except to the extent his testimony is corroborated by reliable documentary evidence.

**[*32]**          5.          Shifting the burden of proof

Section 7491(a) provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for income tax if:  (1) the taxpayer introduces credible evidence with respect to the issue and (2) the taxpayer has satisfied certain other conditions, including that he has complied with the substantiation requirements for any item set forth in the Code and has maintained all records required by the Code.  See sec. 7491(a)(1) and (2). A taxpayer bears the burden of proving that he has met the requirements of section 7491(a).  Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

Such "credible evidence" is evidence of a quality that, after critical analysis, a court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted.  A taxpayer who provides only self-serving[10]

---

[10]As we recently observed in Keels v. Commissioner, T.C. Memo. 2020-25, at *15-*16:

> Witness testimony could almost always be said to be "self-serving", but that factor alone is not a reason to automatically reject the evidence as unreliable. * * *  We decide whether a witness' testimony is credible by relying on objective facts, the reasonableness of the testimony, the consistency of the witness' statements, and the witness' demeanor. * * *  We may discount testimony which we find to be unworthy of belief, * * * but we may not arbitrarily disregard

(continued...)

**[*33]** testimony and inconclusive documentation fails to provide credible evidence.  See Higbee v. Commissioner, 116 T.C. 438, 442-446 (2001); see also Blodgett v. Commissioner, 394 F.3d 1030, 1035-1039 (8th Cir. 2005) (holding the same), aff'g T.C. Memo. 2003-212.

The Larkins argue that the documentary evidence they submitted, combined with Mr. Larkin's testimony at trial, is sufficient to shift the burden of proof.  We disagree.  As we show below, the Larkins' documentary evidence is lacking on almost every issue, and their testimonial evidence--consisting solely of Mr. Larkin's testimony--was not convincing enough to prove any facts without significant corroborating evidence (which is largely absent).  The Larkins have not persuaded us that section 7491(a) applies to shift the burden of proof to the Commissioner.  We conclude that the Larkins bear the burden of proof as to the deficiencies determined.

---

[10](...continued)
testimony that is competent, relevant, and uncontradicted * * *.

**[*34]** D.    Evidence submitted after trial

       1.    The Larkins' motion to supplement the record

The documents we must address in connection with the Larkins' third motion to supplement the record[11] all pertain to their claimed foreign tax credit carryover.  The documents are:  (1) a letter from the IRS to the Larkins dated December 15, 2015, regarding their Form 1040 for 2007 and enclosing a Form 4549, "Income Tax Examination Changes", reflecting that the IRS "will fully reduce the tax shown above, along with any related penalties and interest"; (2) the SNODs issued to the Larkins in April 2008 and March 2009, covering their tax years 2003 through 2006; and (3) the Larkins' answering brief before us in Larkin I.

The Larkins argue that the IRS's letter and Form 4549 support their position "that the tax returns filed in 2008 (and 2009 and 2010) were filed in good faith and to the best of Petitioners' ability given the fact that they did not have the 'final' return for 2007."  They assert with respect to the SNODs and answering brief that "one cannot say or argue that Petitioners were negligent in preparing their 2008

_____

[11]Two of the documents the Larkins offered--a form from HM Revenue & Customs and a letter from PriceWaterhouseCoopers LLC--pertain to an issue that the Commissioner has conceded.  As for these documents, the motion to reopen the record is now moot and we do not address them further.

[*35] tax returns when they did not know the precise amount of Foreign Tax Credits that were available when their 2008 tax return was filed * * * [and that these documents] put[] in context Petitioners [sic] belief as to the Foreign Tax Credit that was available to them for 2008." The Larkins acknowledge that they filed a 2007 tax return that "sought a Foreign Tax Credit, and the Credit was allowed." As reflected in the Form 4549, the amount of FTC allowed was $135,411, an amount that corresponded exactly with the amount of the Larkins' reduced tax liability. The recomputation of the Larkins' tax liability for 2007 detailed in the form does not show the reasons for the adjustments, the computation of the FTC applied to their tax liability for 2007, or whether any FTC remains to carry forward.

Whether to reopen the record to receive additional evidence is a matter within the discretion of the trial court. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); Butler v. Commissioner, 114 T.C. 276 (2000), abrogated on other grounds by Porter v. Commissioner, 132 T.C. 203, 206-208 (2009). A motion to reopen the record will not be granted unless, among other requirements, the evidence relied on: is not merely cumulative or impeaching, is material to the issues involved, and probably would change the outcome of the case. Butler. v. Commissioner, 114 T.C. at 287. We also take into account other

[*36] factors, such as "the character of the additional * * * [evidence] and the effect of granting the motion". See Purvis v. Commissioner, T.C. Memo. 2020-13, at *30 (quoting SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986)). For the following reasons, we will deny the Larkins' motion.

2.    Delay

The Larkins were granted two continuances of their trial. After trial they moved to reopen the record, and the Court directed the Commissioner to cooperate with the Larkins, resulting in the filing of a supplemental stipulation. They filed a second motion to reopen the record, with an equivalent result. The Larkins' third motion to supplement the record was filed simultaneously with their reply brief-- when the Commissioner's opportunity to respond to such evidence under the existing briefing schedule was foreclosed. The Larkins have been given remarkable latitude for preparing and presenting their case. This final additional request is well past the breaking point.

In their motion the Larkins seem to argue, in effect, that they were surprised by a new contention made by the Commissioner in his post-trial answering brief (and that they ought therefore to be allowed to put on evidence to counter that contention). The new contention supposedly raised by the Commissioner was that the absence in this case of evidence regarding the Larkins' earlier tax years

**[*37]** (involved in <u>Larkin I</u>) results in the Larkins' having failed to substantiate the foreign tax credit carryover calculated for those earlier years and therefore having failed to demonstrate the carryover available for 2009. The Larkins argue that the Commissioner changed course and "is essentially taking the position that the information about the prior tax years is relevant" to the foreign tax credit issue with respect to the deficiency for each year as well as the applicable penalties.

In fact, the Commissioner's pretrial memorandum, filed more than two weeks before trial, had stated succinctly: "[T]he materials that have been provided by the petitioners to the respondent are incomplete and unclear in showing <u>the payment history of claimed foreign tax payments</u>." (Emphasis added.) And even if the Commissioner had not so stated, it remains true (as we explain below in part V) that a taxpayer claiming a carryover of a foreign tax credit must establish both the existence of the credit and the amount of any credit that remains (after application to previous years) to be carried over to the year at issue. Inherent in the Larkins' own claim of a credit carryforward--whatever the Commissioner may or may not have stated before trial--is the Larkins' obligation to prove that the credit arose <u>in past years</u> and was not entirely applied <u>in past years</u>. They cannot have been surprised or prejudiced when the Commissioner argued that they had failed to do so.

[*38] Before any audit or litigation, the Larkins had a duty to maintain records to substantiate their return positions. See 26 C.F.R. sec. 1.6001-1(e), Income Tax Regs. ("books or records * * * shall be retained so long as the contents thereof may become material in the administration of any internal revenue law"); see also Bailey v. Commissioner, T.C. Memo. 2012-96, 2012 WL 1082928, at *17 ("There is no provision in section 6001 or the regulations thereunder that excuses taxpayers from retaining their records if the IRS fails to notify them of an imminent challenge"), aff'd, No. 13-1455, 2014 WL 1422580 (1st Cir. 2014). The presence of the FTC carryforward issue in this case from its onset belies the Larkins' assertion that the presence or absence of documentation to substantiate the carryforward (or an alleged excuse for the lack thereof) is somehow newly relevant. They present no valid justification for their delay in offering evidence.

To allow the Larkins to supplement the record with these documents at this juncture would not serve the interests of justice. Cf. Fiedziuszko v. Commissioner, T.C. Memo. 2018-75, at *26 (finding justice by reopening the record to address a section 6751(b) issue when the state of the law on that issue had changed after the record closed and neither party had notice of or raised the issue during the proceedings), aff'd, 796 F. App'x 947 (9th Cir. 2020). The effect of granting the motion would be unfair to the Commissioner, since it would allow

[*39] these documents to come into the record after he litigated an entire case through trial and post-trial briefing.  See Purvis v. Commissioner, T.C. Memo. 2020-13, at *30-*31.

        3.     Materiality

Even if the Larkins could show that their need for evidence related to the FTC carryforward was not apparent before trial, we would deny their motion.  We should reopen the record only where the proffered evidence is material rather than cumulative or impeaching, see Butler v. Commissioner, 114 T.C. at 287; reopening the record is generally not warranted unless the evidence offered will have a probable impact on the outcome of the case.  Relevancy alone is not enough to meet the materiality standard to reopen the record; rather, the Court "will not grant a motion to reopen the record unless * * * the evidence probably would change the outcome of the case."  Id. at 286-287.  The Larkins have not shown the materiality that is required before we could grant their request to reopen the record.

The documents the Larkins now ask us to admit do not add anything material to whether they are entitled to an FTC carryover or should be liable for any penalty arising from claiming an FTC carryover.  The SNODs are simply cumulative of Mr. Larkin's testimony that the earlier years were under

[*40] examination, which (he says) left him in an uncertain position in the preparation of his returns for the years at issue. We address this argument below in part VII and show that, as a matter of law, it is unavailing. Moreover, as a matter of fact the contention that when the return was due Mr. Larkin could not compute his FTC carryover is self-contradicted, because he unequivocally took the position at trial that the FTC carryover to 2009 could be calculated using the information from his 2007 and 2008 returns and Schedules K-1 from SSD for the years at issue. Therefore the Larkins cannot persuasively argue that uncertainty in their allowable foreign tax credit for years before 2007 prevented them from making a claim, on the basis of the information available to them at the time they prepared their returns for the years at issue, for an FTC carryover to 2009-- particularly when they did in fact make such a claim.

The IRS Form 4549 showing that $135,411 of FTC was used and allowed in 2007 likewise has little bearing on this case; it shows that the Larkins apparently had sufficient information to claim an FTC for 2007 that was ultimately allowed. They now argue that to claim the FTC for a later year was impossible and yet that they are entitled to it. Because the Form 4549 contains no information about the computation of the FTC or whether any remains to carry forward, see 26 C.F.R.

[*41] sec. 1.905-2(a)(2), Income Tax Regs., this document cannot serve the purpose of substantiating the credit.

The information offered does not justify reopening the record under the considerations set forth in Butler v. Commissioner, 114 T.C. at 286-287.  For these reasons we will deny the Larkins' third motion to supplement the record and will grant the Commissioner's motion to strike any references in the Larkins' reply brief to the material that was the subject of the motion.

II.     Schedule A deductions

Taxpayers who itemize their deductions are allowed to deduct interest paid during the taxable year with respect to certain types of indebtedness.  Sec. 163.

   A.     Mortgage interest[12]

      1.     General principles

Section 163(h)(3) provides that interest on a qualified residence is deductible by non-corporate taxpayers.  Qualified residence interest encompasses interest payments on two types of debt:  acquisition indebtedness and home equity indebtedness.  Sec. 163(h)(3)(A).  "Acquisition indebtedness" generally means debt incurred in, or that results from the refinancing of debt incurred in,

_____

[12]Cf. Larkin I, at *62-*64 (holding that home mortgage interest deducted for the years 2003-06 was not substantiated); Larkin II, 2020 WL 2301462, at *1 (affirming).

**[*42]** "acquiring, constructing, or substantially improving" a qualified residence.

Sec. 163(h)(3)(B)(i). "Home equity indebtedness" generally means indebtedness,

other than acquisition indebtedness, that is secured by a qualified residence and

that does not exceed the difference between the home's fair market value and the

amount of acquisition indebtedness. Sec. 163(h)(3)(C)(i).

The deduction for interest on a qualified residence is subject to a $1 million

limit for "[t]he aggregate amount treated as acquisition indebtedness for any

period" and a $100,000 limit for "[t]he aggregate amount treated as home equity

indebtedness for any period". Secs. 163(h)(3)(B)(ii), (C)(ii).

2.     Analysis

The Larkins contend that they are entitled to additional mortgage interest

deductions for 2008 and 2010.

a.     2008

For 2008 the SNOD allowed interest payment deductions for $24,270, an

amount reported by third parties. The Larkins argue they are entitled to an

**[*43]** additional mortgage interest deduction in the amount of $28,667.[13]  The

mortgage interest deduction for 2008 is not properly at issue.  See supra part I.B.1.

> b.    2010

The Larkins claim they are entitled to deduct $6,673 of mortgage interest for

2010.  However, the account statements lack sufficient details to prove the interest

paid was for acquisition indebtedness or home equity on a qualified residence, and

therefore the Larkins are not entitled to a deduction.

> B.    Investment interest[14]

Personal interest is nondeductible unless it falls under one of the exceptions

enumerated in section 163(h)(2), which allows for the deduction of "investment

---

[13]The Larkins attempt to substantiate their position by documentary evidence consisting of a letter with an interest payment schedule and several bank statements from Bank Leumi.  Though the letter refers to the loan as a "mortgage loan", there is no evidence to indicate whether the underlying debt is the type of debt allowed--i.e., acquisition indebtedness or home equity indebtedness.  The evidence the Larkins provided also fails to establish that the loan is for a qualified residence within the meaning of section 163.  (Contrary to their argument, the bank's action of addressing the letter to their "home address" does not substantiate this point.)  Moreover, the Larkins improperly attempt to deduct 100% of the interest payments from the loan even though the amount of indebtedness--i.e., $2.43 million, after applying the stipulated exchange rate--is over the $1 million limit provided by section 163(h)(3).  See sec. 163(h)(3)(B)(ii), (C)(ii); sec. 1.163-10T, Temporary Income Tax Regs., 52 Fed. Reg. 48410 (Dec. 22, 1987).

[14]Cf. Larkin I, at *56 (holding that investment interest claimed for each of the years 2003-06 was not substantiated); Larkin II, 2020 WL 2301462, at *1 (affirming).

[*44] interest". Investment interest is defined as interest which is paid or accrued on indebtedness properly allocable to property held for investment. See sec. 163(d)(3). An individual's deduction for investment interest expenses cannot exceed his net investment income. Sec. 163(d)(1).

### 1. The Larkins' brief vs. the Larkins' "Table 1"

After conceding some of what they reported on their returns, the Larkins contend in their post-trial brief "that the entities to whom they did make payments of investment interest are Bank of America, Blackhorse, Coutts and Fidelity (IRA). These amounts total $15,760, $25,730 and $24,875 for the years 2008, 2009 and 2010 respectively." However, the Larkins' own chart setting out their alleged investment interest (in "Table 1" attached to the same brief) says radically otherwise. The chart does list amounts of interest allegedly attributable to those four named entities (and to Larmodt LLC and Treetops LLC); however, the yearly totals are not as the Larkins state in their briefs but instead are much lower--i.e., $10,333, $10,160, and $15,461. The larger amounts in the brief are unexplained and unsubstantiated, and we consider further only the smaller amounts in Table 1-- and only the amounts for 2009 and 2010, since investment interest for 2008 is not properly at issue. See supra part I.B.1.

**[*45]**     2.     Interest paid via Larmodt LLC and Treetops LLC

The Larkins' chart of investment interest on Table 1 includes their shares of the interest payments by Larmodt LLC, which account for $5,278 for 2009 and $6,150 for 2010. These are the amounts that were allowed in the SNOD and that the parties have stipulated are attributable to the Larkins' ownership interests in Larmodt LLC. Accordingly, regarding these items there is no dispute that we are called upon to resolve.

     3.     Four other entities

As we noted above, the Larkins' chart of investment interest on Table 1 includes alleged payments to four other entities (although some of the amounts are described on that chart as interest "charged", not "paid"). The substantiation that the Larkins proffer for the investment interest claimed as paid to the other four entities consists of monthly statements from those entities. While the Court accepts that the Larkins may have made payments to these financial institutions, the Larkins did not prove that the payments were within the exception set forth in section 163(h)(2)(B), i.e., "investment interest (within the meaning of subsection (d))". The Larkins admit in their post-trial reply brief that "Petitioners did not provide a detailed tracking of the borrowed money to a particular investment" and instead rely on Mr. Larkin's testimony to substantiate their

[*46] deduction.  His testimony was not convincing; and accordingly, the Larkins

failed to substantiate any investment interest deductions claimed in excess of the

amounts respondent already allowed for 2009 and 2010.

> C.     Taxes[15]

Section 164(a)(1) allows a deduction for "State and local, and foreign, real

property taxes" paid within the taxable year; and section 164(a)(3) allows a

deduction for "State and local, and foreign, income * * * taxes."  The Larkins

claim they are entitled to additional itemized deductions for taxes paid in the

amounts of $3,465 for 2008, $2,508 for 2009, and $2,060 for 2010.  The tax

deduction for 2008 is not properly at issue.  See supra part I.B.1.[16]  For the reasons

discussed here, we hold the Larkins are not entitled to additional deductions for

taxes for 2009 and 2010:

---

[15]Cf. Larkin I, at *64-*65 (holding that local real estate taxes reported for 2003 and 2004 were substantiated); Larkin II, 2020 WL 2301462, at *3 (affirming).

[16]Documentation generated by SSD (an entity in which Mr. Larkin was a partner but which we do not assume he controlled) showing tax payments it made for 2008 supports the Larkins' position that they paid State and local taxes of $7,136, and we find that they did pay this amount as withheld and paid over by SSD.  However, this amount is less than the $8,876 deduction for taxes that was allowed in the SNOD.

**[\*47]**        1.        <u>2009</u>

In their opening post-trial brief the Larkins claimed a total of $8,927 in deductible taxes for 2009. On audit respondent had allowed a deduction of only $6,419 for taxes paid by the Larkins--consisting of $6,119 in State and local taxes (which we find substantiated by an SSD document reporting $6,015, which the Larkins describe as "Squire Sanders 2009 Tax Return <u>Schedule 4</u> State and Municipal Non-Resident Taxes Withheld on behalf of D. Larkin" (emphasis added)) and $300 in personal property tax. The Larkins claimed they were entitled to an additional deduction for the difference, i.e., an additional $2,508 for taxes paid. Their Table 1 listed this additional amount as "Squire Sanders 2009 Tax Return <u>Schedule 6</u> Municipal Tax paid and charged to D. Larkin." (Emphasis added.) As the Commissioner points out in his answering brief, the documentation on which the Larkins rely explicitly states that the amount was "to be used for city resident tax credit purposes only and do[es] not represent federal income tax deductions." In their reply brief, the Larkins attempt a different approach:

> Petitioners have put forth support for an additional "income tax" deduction of $6,015, not additional real estate taxes. (Ex. 7-P #263). Petitioners concede the nondeductibility of the additional $2,912 of income taxes previously claimed. As a result, this Court should allow the additional $6,015 of income taxes, plus the amount of $6,119 in real estate taxes previously allowed for a total of $12,134.

**[*48]** But their proof for this supposed "additional 'income tax' deduction" is the only visible proof that supported the IRS's allowance in the SNOD.[17] The Larkins have no <u>additional</u> proof of any further income tax deduction, and we allow nothing more than the SNOD allowed.

  2. <u>2010</u>

On Schedule A of their Form 1040 for 2010, the Larkins claimed a deduction for State and local taxes of $2,305, which the SNOD did not disallow, and which the Commissioner concedes. Table 1 in their opening brief shows that, as for 2009, this deductible amount corresponds to "Squire Sanders 2010 Tax Return <u>Schedule 4</u> State and Municipal Non-Resident Taxes withheld on behalf of D. Larkin". (Emphasis added.) However, the Larkins also claimed on their 2010 return a real estate tax deduction of $5,400, which was disallowed in the SNOD and as to which "Petitioners concede that they have no additional documentation to support the $5,400 of real estate taxes claimed."

Instead, the Larkins now attempt to claim an additional $2,060 deduction for income tax by referring (as they originally did for 2009, before conceding it) to

---

[17]The Larkins' current attempted characterization of the $6,119 deduction is contradicted by their own Schedule A. The $6,119 deduction that the IRS allowed is clearly placed beside "state and local taxes" on Schedule A, rather than "real estate taxes" (a section filled in with the amount of $5,400, which was disallowed), as the Larkins now claim.

**[*49]** a "Squire Sanders 2010 Tax Return Schedule 6 Total Allocable Taxes paid by firm and charged to D. Larkin." (Emphasis added.) The Commissioner's answering brief demonstrated (as it did for 2009) that the 2010 documentation on which the Larkins relied for that argument explicitly states that the amount was "to be used for city resident tax credit purposes only and do[es] not represent federal income tax deductions. See Schedule 4 for state and municipal taxes that are deductible for federal income tax purposes."

In their reply brief, the Larkins fall silent as to reliance on the SSD "Schedule 6" for an additional income tax deduction and seem to attempt to revive a deduction for real estate tax of $5,400--acknowledging again that they lack documentation for that amount but stating simply that they "believe that it is consistent with real estate taxes for prior years." They do not actually point to any such amounts claimed for prior years; but even if they could do so, they would not thereby substantiate a claim of real estate taxes paid in 2010.

The Larkins did not show entitlement to any deduction for income taxes or real estate taxes beyond what the IRS allowed in the SNOD.

[*50] III.    Schedule E rental real estate expenses[18]

A.    Lack of substantiation

Sections 162 and 212 generally permit taxpayers to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business or for the production of income.  The Larkins engaged in rental real estate activities, though the quantum of those activities was extremely modest.  They did not offer into evidence documentation in the form of leases, rental agreements, receipts, communications with tenants, depreciation calculations, or any type of records substantiating expenses incurred in rental real estate activity for any of their properties (the Belmont condominium in Chicago,[19] the lake house in Wisconsin,[20]

---

[18]Cf. Larkin I, at *61 (holding that rental expenses reported for 2003 were not substantiated because no evidence showed such expenses were incurred and paid or were attributable to property held for the production of income); Larkin II, 2020 WL 2301462, at *1-*2 (affirming).  In Larkin I no issue was raised with respect to the applicability of section 469.

[19]The only residents of the Belmont property whom the Larkins identified were their daughters.  Moreover, on their untimely 2008 Form 1040 submitted to the IRS, they reported a loss of $75,000 on the supposed sale of the Belmont property, though they now assert that they did not sell the property in 2008.

[20]The Larkins admit that they personally used the lake house--their "second home"--for at least four to six weeks during each of the years at issue and that they do not like to rent it out.  They offered no evidence identifying any tenant; and they allege only that they rented out the lake house for, "at most", three weeks a year.

[*51] a property in France, and a financial interest in the Denton Homes lot in England[21]).

The Larkins did offer 2009 and 2010 Schedules K-1 for Larmodt LLC issued to both Mr. and Mrs. Larkin, showing deductible expenses totaling $9,078 for 2009 and $11,116 for 2010.  The parties have stipulated that the amounts of "interest expense" reported by Larmodt LLC on these Schedules K-1 were the amounts that the Commissioner did not disallow as investment interest for 2009 and 2010.  We assume that the remainder of these amounts on the Schedules K-1 for Larmodt LLC was expended for the rental activities and was properly reportable on Schedule E.[22]

_____

[21]The Larkins claim that after selling the Denton Homes lot in 2007 they nonetheless retained an interest in the property and that they still hold a note on the lot, which (they contend) "was part of Petitioners' 'real property, trades or businesses' pursuant to Internal Revenue Code Section * * * 469(c)(7)(C)." However, on the untimely 2008 Form 1040 that they submitted to the IRS, they reported a loss of $235,000 on the supposed sale of a "note from Denton Homes."

[22]The reporting of an item on a return does not substantiate that item.  See Lawinger v. Commissioner, 103 T.C. 428, 438 (1994) ("Tax returns do not establish the truth of the facts stated therein").  However, because the evidence does not show the identity or nature of the fifth unnamed partner of Larmodt LLC, we cannot tell definitively whether it was a "small partnership" under section 6231(a)(1)(B), see supra note 4, or whether instead it might have been a TEFRA partnership whose items we could not adjust in this deficiency case.  Neither party has made any contention nor put on any evidence as to whether TEFRA would bar our disallowance of the deductions reported on the Schedules K-1 and claimed by
(continued...)

**[\*52]** B.     Section 469

However, even assuming that the Schedules K-1 substantiated expenses related to those rental real estate activities, the Larkins' claim of deductible losses from those activities would founder on section 469:  In the case of an individual or entity listed in section 469(a)(2), section 469 disallows any current deduction for a passive activity loss.  Sec. 469(a)(1), (b).  A passive activity loss is equal to the aggregate losses from all of the taxpayer's passive activities minus the aggregate income from all passive activities.  Sec. 469(d)(1).  Generally, a passive activity is any trade or business in which the taxpayer does not materially participate, see sec. 469(a)(1), (c)(1); and rental activity (i.e., any activity where payments are

---

[22](...continued)
the Larkins at trial.  One approach we might take is simply to impose on the Larkins--who are the proponents of the Schedules K-1--the burden of showing the facts that, under TEFRA, would require us to honor Larmodt LLC's apparent reporting of these items.  Since they failed to do so, we could find that TEFRA does not apply and could simply disallow the deductions as unsubstantiated.  Cf. Larkin II, 2020 WL 2301462, at \*1 ("The Larkins also assert various conclusory legal positions without citing any source of law, as when they claim, without support, that \* \* \* their rental cost deduction is 'a large partnership item entitled to deference'").  However, we instead effectively assume (in part III.A) that Larmodt LLC was a TEFRA partnership, and that these amounts constitute partnership items, the reporting of which we cannot adjust in this deficiency case; but we find (infra part III.B) that even if we honor Larmodt LLC's reporting on its Schedules K-1, the items when passed through to the Larkins are not deductible for them at the individual partner level.

[*53] principally for the use of tangible property, sec. 469(j)(8)) is generally a per se passive activity, see sec. 469(c)(2).

An exception to that general rule is found in section 469(c)(7), which exempts the rental activity of the taxpayer from the definition of passive activity under section 469(c)(2) but continues to treat rental real estate activity as a trade or business subject to the material participation requirements of section 469(c)(1). The taxpayer will qualify for this exception (as a "real estate professional", in the non-statutory lingo of the caselaw) if: (1) more than one-half of the personal services performed in trades or businesses by the taxpayer during the taxable year is performed in real property trades or businesses in which she materially participates and (2) the taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates. Sec. 469(c)(7)(B). A taxpayer materially participates in an activity "only if the taxpayer is involved in the operations of the activity on a basis which is--(A) regular, (B) continuous, and (C) substantial." Sec. 469(h)(1).

With respect to the evidence that may be used to establish hours of participation, 26 C.F.R. section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides:

[*54] The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

The regulation quoted above does not allow a party to rely on a post-event "ballpark guesstimate" or unverified, undocumented testimony. See Moss v. Commissioner, 135 T.C. 365, 369 (2010); Lum v. Commissioner, T.C. Memo. 2012-103, 2012 WL 1193182, at *4.

Petitioners argue that Mrs. Larkin is a "real estate professional" who qualifies for the material participation exception applicable to the passive activity loss limitation for rental real estate activity as defined in section 469(c)(7)(B). Although she identified herself as a "homemaker" on their tax return for each of the years at issue, petitioners contend that Mrs. Larkin devoted a substantial amount of time to managing the aforementioned properties, that this time constituted more than half of her professional services, that she materially participated in the management of the property, and that the time devoted to the real estate activity exceeded 750 hours--nearly 15 hours per week--for each of the years at issue. Remarkably, Mrs. Larkin did not testify about her supposed

**[\*55]** engagement in this activity. Rather, to support their claim, petitioners rely on <u>Mr.</u> Larkin's testimony and a non-contemporaneous summary time log[23] prepared for purposes of trial.

This evidence is insufficient to satisfy the requirements of section 469. The time log, created in response to discussions with respondent, was allegedly the result of Mr. Larkin's review of emails, notes of board meetings, and other primary sources. Yet the Larkins did not offer into evidence those underlying documents. The time log did not qualify as a record of a regularly conducted activity for purposes of Rule 803(6) of the Federal Rules of Evidence, nor as a summary of those alleged underlying documents for purposes of Rule 1006. Rather, the log was admitted into evidence only for demonstrative purposes. We find that this evidence is exactly the type of post-event "ballpark guesstimate" that we disapproved in <u>Moss v. Commissioner</u>, 135 T.C. at 369 ("the regulations do not allow a post-event 'ballpark guesstimate'").

---

[23]Petitioners' time log, which was admitted solely as a demonstrative exhibit, summarizes the hours that the Larkins allegedly spent managing their investments and indicates that the time Mrs. Larkin spent managing petitioners' four property interests totaled 764 hours in 2008, 792 hours in 2009, and 772 in 2010. The "log" contains no description of how these hours were spent, allocating only a certain number of hours per property per month. Its information is bare and devoid of detail, as was Mr. Larkin's testimony on this issue.

**[*56]**      Since Mrs. Larkin fails to meet the 750-hour requirement, it is not necessary to address the "more than one-half of personal services" requirement or to discuss the subsequent analysis of material participation in the light of the Larkins' failure to make the election to treat all of their real estate activities as one activity.  See sec. 469(c)(7)(A); sec. 1.469-9(e)(1), (g), Income Tax Regs.  Even if the Court performed this analysis, we would find the evidence the Larkins provided deficient for the reasons discussed above.

For all of these reasons, petitioners failed to shift the burden to respondent, and their rental real estate activities must be treated as passive under section 469(c)(2).  See sec. 469(c)(7)(B)(ii). Therefore, they are not entitled to deduct the losses for those real estate activities shown on their Schedules E in 2008, 2009, and 2010.

IV.    Self-employed health insurance

A self-employed taxpayer may deduct health insurance costs paid for medical care for himself and his family, subject to the special rules of section 162(l).  Pursuant to section 162(l), the deduction may not exceed the "taxpayer's earned income (within the meaning of section 401(c)) derived by the taxpayer from the trade or business with respect to which the plan providing the medical care coverage is established."  Sec. 162(l)(2)(A).

[*57] The Larkins claim deductions for health insurance premiums of $15,700 for 2009 and $12,700 for 2010. (Respondent conceded that the Larkins are entitled to self-employed health insurance deductions for 2008 in the amount they claimed and, for the other years, in the amounts for which the Larkins proffered receipts showing payment--i.e., $7,178 for 2009 and $2,192 for 2010.) The Larkins admit they lack records that reflect the full amounts of their claimed deductions for 2009 and 2010. However, without specifically citing Cohan, they argue that Court should allow in full the deductions claimed since (the Larkins contend) they proved that they spent some amounts on health insurance and the deductions they seek are reasonable.

We find that the Larkins did not prove that they spent the amounts on health insurance claimed. While Cohan does allow the Court to estimate an otherwise allowable deduction for self-employed health insurance, the Larkins' receipts did not indicate consistent payments and did not show coverage during the entire year, and the Larkins did not provide a sufficient explanation for how they calculated the amounts they reported for 2009 and 2010. We hold that, even under the more flexible standard provided by Cohan, the Larkins failed to present sufficient evidence to substantiate the amounts reported. See Williams, 245 F.2d at 560.

[*58] V.      Foreign tax credit[24]

Section 901(a) generally allows a taxpayer FTCs for foreign income taxes paid, subject to the limitation imposed by section 904, which in turn limits the credit to the amount of U.S. tax on foreign income. See generally secs. 901, 904. An FTC is allowed only to the extent that the taxpayer can prove it was "paid or accrued" with respect to income from sources without the United States. Section 905(b)(1) and (2). Even if a taxpayer proves payment of foreign tax, a credit for the tax for a particular year may be limited by section 904(a); however, a taxpayer may carry back to the first preceding taxable year or carry forward to any of the first 10 succeeding taxable years any excess foreign tax paid or accrued for the year at issue. Sec. 904(c). The Larkins' only claim in this case as to an FTC is that for 2009 they are entitled to a carryforward credit of $16,207 arising from an alleged carryover from prior years. On this issue, the Larkins rely on Mr. Larkin's

---

[24]In Larkin I, at *71-*73, the Commissioner conceded that the Larkins "paid income taxes to the U.K. aggregating £218,914 during FYE March 31, 2000, 2001, and 2002." However, we found in that case that the Larkins failed to substantiate the existence of a credit that could be carried over to the subsequent years 2003, 2004, 2005 and 2006. Id. at *72-*73 ("A taxpayer claiming a carryover of a credit must establish both the existence of the credit and the amount of any credit that may be carried over to a subsequent year"); cf. Larkin II, 2020 WL 2301462, at *1-*3 (affirming). There, as here, the only substantiation offered with respect to an FTC carryover was the Larkins' uncorroborated assertion that the tax was paid in a past year and they should receive a carryover credit.

[*59] testimony for the proposition that using the 2007 and 2008 returns, along with the 2008 Schedule K-1 for SSD, the FTC "can be calculated".

The Larkins suggest that unresolved issues from prior years at the alleged time of filing, combined with Mr. Larkin's status as a partner in a business doing business overseas and the method of SSD's payment of foreign income taxes, makes it "reasonable to conclude that [p]etitioners paid foreign income taxes and that the amount claimed is reasonable." However, mere "reasonable[ness]" in a party's contentions is not the standard for substantiating FTCs (nor the standard for shifting the burden of proof to the Commissioner). A taxpayer claiming an FTC carryover must establish both the existence of the credit and the amount of any credit that remains (after application to previous years) to be carried over to the year at issue. See Rule 142(a)(1); Segel v. Commissioner, 89 T.C. 816, 842 (1987); cf. Keith v. Commissioner, 115 T.C. 605, 621 (2000). Such credit shall be allowed "only if the taxpayer establishes to the satisfaction of the Secretary--(1) the total amount of [non-U.S. sourced] income * * * , (2) the amount of [non-U.S. sourced] income derived from each country, [and] the tax paid or accrued to which is claimed as a credit * * * , and (3) all other information necessary for the verification and computation of such credits." Sec. 905(b).

[*60] The "[c]onditions [imposed by the Secretary] of allowance of credit" pursuant to section 905 are, in relevant part:

> [T]o claim the benefits of the foreign tax credit, the claim for credit shall be accompanied by Form 1116 in the case of an individual * * *.
>
> * * * The form must be carefully filled in with all the information called for and with the calculations of credits indicated. Except where it is established to the satisfaction of the district director that it is impossible for the taxpayer to furnish such evidence, the taxpayer must provide upon request the receipt for each such tax payment if credit is sought for taxes already paid * * * .

26 C.F.R. sec. 1.905-2(a), Income Tax Regs. (emphasis added). Other than the Forms 1116 submitted with the Larkins' tax returns for 2008 and 2009, which are devoid of any information as to how the FTCs claimed for those years were calculated, there is no information in our record that might bear on the Larkins' claim of an FTC carryover for 2009.

We find that the Larkins failed to substantiate the existence and amount of the FTC with credible evidence. The documents that they advance in support of their position fail to provide any specific amounts of foreign taxes that were paid (and, relevant to the application of the limitation at section 904(d), fail to provide any characterization of the income on which they were paid) in the relevant years. The Larkins' 2007 return is not in evidence, so we are unable to ascertain what amount of credit was allowed for that year or how it was computed (nor is there

**[*61]** any other evidence to that effect).[25]  The Larkins' Form 1040 for 2008,

though purporting to claim a credit of $16,785 and indicating on the attached

Form 1116 a "carryover" of credit, omits the "detailed computation" that the form

requires.  Lastly, the Schedules K-1 from SSD for 2008, 2009, and 2010 shed little

light on whether the Larkins paid any amount of foreign tax for which they could

claim a carryover of credit for 2009.  Instead, the Schedules K-1 contain the

following statement with respect to foreign taxes:

> The Firm deducts foreign taxes in computing DNI, but they are not a
> deduction in the computation of Ordinary Income and are required to
> be stated separately.  Depending on the individual partner's tax
> circumstances you may be able to claim a tax credit for this amount
> (Form 1116).  Any amount not creditable this year may be carried
> back one year and forward for ten years.

Mr. Larkin's Schedule K-1 for 2009 from SSD contains only a few items in Part II,

"Partner's Share of Current Year Income, Deductions, Credits and Other Items":

i.e., guaranteed payments of $372,149; self-employment earnings of $372,149;

distributions of $374,750; and, in the box for "foreign transactions", the word

"various".  We find no indication as to any amounts that SSD actually paid for

foreign taxes on behalf of Mr. Larkin.  (And the paragraph relating to foreign

---

[25]Nor do the documents substantiate the amount(s) of the Larkins' U.S. tax liabilities for those years, another element necessary to show that they were entitled to carry over specific amounts of FTC.  See Larkin II, 2020 WL 2301462, at *3.

[*62] taxes suggests that if Mr. Larkin paid them through SSD, they should appear as a separately stated item on his Schedule K-1.)

The Larkins' claim that a previous year's unresolved issue was to blame for any unclarity, or that the Court should allow a carryover simply because it was allowed in a prior year, is unavailing. Each tax year stands on its own and must be separately considered, and the Commissioner is not bound for any given year to allow a deduction permitted for a prior year. See United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969); Pekar v. Commissioner, 113 T.C. 158, 166 (1999).

Petitioners did not provide sufficient documentation, calculations, or evidence that substantiates the FTC carryover claimed for 2009. Because they failed to prove they are entitled to an FTC, we will sustain the disallowance of this credit.

VI.   Section 6651(a)(1) additions to tax

Section 6651(a)(1) imposes an addition to tax for failure to file a return by its due date unless the taxpayer demonstrates that the failure to file was due to reasonable cause and not due to willful neglect. The addition to tax equals 5% of the amount of tax required to be shown on the return, less any tax actually paid (i.e., the amount of the tax that is due and not paid) for each month (or fraction thereof) that the return is late, but may not exceed 25% in total. See sec.

[*63] 6651(a)(1), (b)(1).  Thus, the maximum addition to tax is reached when a return is five months late.  Reasonable cause may exist if a taxpayer exercised ordinary business care and prudence and was nonetheless unable to file a return within the time prescribed by law.  See 26 C.F.R. sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Willful neglect connotes "a conscious, intentional failure or reckless indifference" with respect to timely filing.  United States v. Boyle, 469 U.S. 241, 245 (1985).  Respondent determined that the Larkins are liable for additions to tax pursuant to section 6651(a)(1) for 2008, 2009, and 2010 for failure to file timely.

The Commissioner bears the burden of production with respect to the addition to tax under section 6651(a)(1).  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447.  To meet this burden, he must produce sufficient evidence that it is appropriate to impose the addition to tax.  Once the Commissioner has met his burden, the burden of proof as to reasonable cause or other mitigating factors shifts to the taxpayer.  See Higbee v. Commissioner, 116 T.C. at 447.

Even if the Larkins' 2008 return, due December 2009, was (contrary to our finding) filed in June 2011 on the date the Larkins allege it was mailed (i.e., about 18 months late), the maximum addition to tax had been reached well before that

**[*64]** date, at the time it was five months late. The Larkins' 2009 return, due on October 15, 2010, was filed on November 8, 2011 (more than 12 months late). The Larkins' 2010 return, due on Monday, October 17, 2011, was filed on November 16, 2011 (one month late). Accordingly, respondent has met his burden of production with respect to the additions to tax.

The Larkins argue that they are not liable for the additions to tax because they had reasonable cause--i.e., their returns for previous years were under examination by the IRS on the respective due dates for their 2008, 2009, and 2010 returns. But as the Larkins acknowledge, this Court has not found that open years constitute a sufficient reason for finding reasonable cause for late filing. Accord Denenburg v. United States, 920 F.2d 301, 306 n.10 (5th Cir. 1991) (stating that an audit of a prior tax year was not sufficient to establish reasonable cause for late filing of a subsequent affected year); see Estate of Duttenhofer v. Commissioner, 49 T.C. 200 (1967) (holding that taxpayer did not establish reasonable cause to excuse late filing where there was pending estate litigation that might affect tax liability at issue), aff'd, 410 F.2d 302 (6th Cir. 1969); Namakian v. Commissioner, T.C. Memo. 2018-200, at *12 ("the pendency of litigation, even where the decision for an earlier year may affect the determination of a taxpayer's liability for a later year, is not reasonable cause for failure to timely file").

**[\*65]** We hold that the Larkins did not have reasonable cause for the untimely filing of their returns, and we sustain respondent's determination that they are liable for additions to tax under section 6651(a)(1) for 2008, 2009, and 2010.

## VII.   Accuracy-related penalty

Section 6662 imposes an "accuracy-related penalty" of 20% of the portion of an underpayment of tax attributable to (among other things) the taxpayer's negligence or disregard of rules or regulations.  Sec. 6662(a), (b)(1), (c).

### A.   2008

Section 6664(b) provides:  "The penalties provided in this part [i.e., title 26, subtitle F, chapter 68, subchapter A, part II ("Accuracy-Related and Fraud Penalties", secs. 6662-6664)] shall apply only in cases where a return of tax is filed".  The principal penalty for <u>not</u> filing a return is the addition to tax under section 6651(a)(1) (discussed above).  When a taxpayer fails to file a return, the accuracy-related penalties (such as the negligence penalty at issue here) do not apply.

Though the evidence is equivocal, we have found--as the Commissioner contends--that the Larkins did not file a return for 2008.  The Larkins contend that they filed their return for 2008 around the same time they filed their other returns at issue, "within about two weeks at the end of November, maybe into the first few

[*66] days of December, 2011." The copy of the 2008 Form 1040 in evidence reflects a handwritten date of "28 Oct 2011" but no conclusive indication on the face of the document that it was submitted to or received by the IRS.[26] The Commissioner has submitted in evidence a Form 4340, "Certificate of Assessments and Payments", that reflects several entries commencing in November 2011, that indicate an "amended return filed" for 2008; but the Commissioner nonetheless repeatedly maintains in his brief that "[p]etitioners failed to file a tax return (Form 1040) for tax year 2008." The Commissioner refers to the Form 4340 as evidence that the Larkins did not file a return for 2008, and we accept his statement as to the meaning of the entries in his records. The resolution of this issue bears only on the application of the accuracy-related penalty determined by the Commissioner, an issue on which he bears the burden of production under section 7491(c) and for which the non-filing of the 2008 return is favorable to the Larkins. Having found, as the Commissioner insists, that the Larkins did not file a return for 2008, we cannot sustain a negligence penalty for 2008.

---

[26]Faded handwriting across the top of the return indicates "delinq. return * * * [illegible] 8-23-12".

**[\*67]** B.  2009 and 2010

1.  The Commissioner's burden of production

Under section 7491(c), the Commissioner bears the burden of production and must produce sufficient evidence that the imposition of the penalty is appropriate in a given case--in this case, evidence that the underpayment is attributable to negligence.  Once the IRS meets this burden, the taxpayer must come forward with persuasive evidence that the IRS's determination is incorrect. Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

a.  Showing of negligence

Negligence can be either the lack of due care or the failure to act reasonably under the circumstances.  See Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence "includes any failure to make a reasonable attempt to comply with * * * [the internal revenue laws]", sec. 6662(c), including any failure by the taxpayer to keep adequate books and records or to substantiate items properly, 26 C.F.R. sec. 1.6662-3(b)(1), Income Tax Regs.  We find that the Larkins' record-keeping was in disarray--to an extent that suggests either that they do not keep adequate records to substantiate their income tax positions, or that such records, if available, were not offered.  The records that were offered, such as the "log" of Mrs. Larkin's time allegedly spent managing the Larkins' real estate

[*68] interests, are grossly inadequate to substantiate their contentions.  In short, the Larkins failed to timely report large amounts of income, and they claimed substantial deductions for which they had either insufficient proof or no proof at all.  We find that they were negligent in the preparation of their returns for the years for which the section 6662 accuracy-related penalty has been properly determined--i.e., 2009 and 2010.

### b.      Supervisory approval

The Commissioner's burden of production under section 7491(c) also requires him to show that, in compliance with section 6751(b)(1), the immediate supervisor of the individual IRS employee who made the "initial determination" of the penalty approved that penalty in writing.  See Graev v Commissioner, 149 T.C. 485.  In this case the parties have stipulated that the supervisor gave his approval 10 months before the issuance of the SNOD; and the Larkins made no contention that anyone in the IRS made any communication to them of an initial determination before that approval.  The Commissioner has therefore carried his burden of production as to section 6751(b)(1).  See Frost v. Commissioner, 154 T.C. ___, ___ (slip op. at 23) (Jan. 7, 2020).

The Larkins contend that the supervisor's approval did not satisfy section 6751(b)(1).  They argue:  "The clear implication under section 6751(b)(1)

[*69] requiring the 'immediate supervisor' to have 'personally approved (in writing)' the initial determination of the assessment of a penalty, is that the supervisor actually have knowledge of facts to support a basis for the penalty"-- but in this instance (the Larkins maintain) it appears that the supervisor lacked information and made unwarranted conclusions. That is, they would undermine the penalty approval by showing that it was granted inappropriately.

However, the question under section 6751(b)(1) is simply whether the supervisor in fact approved the penalty, not "the propriety of the Commissioner's administrative policy or procedure underlying his penalty determinations", Raifman v. Commissioner, T.C. Memo. 2018-101, at *61, nor whether the supervisor "adequately contemplated the * * * [Larkins'] reasonable cause defense", id. at *60, nor any other aspect of the merits of the penalty determination. The Larkins can make such merits challenges as a part of their case, but not as a means of invalidating the IRS's compliance with section 6751(b)(1).

### 2. Reasonable cause and good faith

#### a. Standards

The section 6662(a) penalty is not imposed if a taxpayer can demonstrate: (1) that he had reasonable cause for the underpayment and (2) that he acted in

[*70] good faith. Sec. 6664(c)(1). Whether a taxpayer acted with reasonable cause and in good faith is a facts-and-circumstances decision, and the most important factor is the extent of the taxpayer's efforts to assess his proper tax liability. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs. Also important is the taxpayer's knowledge and experience. Id. We find that Mr. Larkin's professional experience as an attorney who has spent a significant amount of his time in the financial sector weighs against him in this regard.

A taxpayer may establish reasonable cause and good faith by demonstrating reasonable reliance on the advice of an independent, competent professional adviser as to the tax treatment of an item. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 98. To prevail on this defense, a taxpayer must establish that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Id. at 99.

### b. The Larkins' contentions

The Larkins contend that issues from previous years, misunderstandings about the qualifications for certain deductions, their supposedly good-faith belief that Mrs. Larkin qualified as a "real estate professional", and the complexity of the

**[\*71]** Code combine to create sufficient reason to find reasonable cause for their underpayments.  Finally, the Larkins claim they sought the advice of professionals.

### c.    Analysis

The Larkins did not make a plausible showing of reasonable cause and good faith.  Their record-keeping was in disarray; they failed to timely report large amounts of income; they claimed substantial deductions for which they had no proof at all and others for which their proof was insufficient.

The Larkins are sophisticated business people.  Mr. Larkin is a highly educated attorney with more than 20 years' experience dealing in a variety of complex transactional matters.  He was certainly capable of keeping appropriate, contemporaneous records, preparing detailed notes, and distinguishing personal from business expenses, yet the evidence he used to substantiate their deductions shows that he failed to make these efforts.  Mr. Larkin disregarded instructions for properly completing his returns, as evidenced by his failure to attach underlying documents and the forms and calculations required to claim certain loss deductions.  Such inaccurate and misleading income tax reporting does not reflect a reasonable attempt to comply with the Code.

[*72] There is no evidence besides Mr. Larkin's testimony that the Larkins sought advice in the preparation of their returns. The evidence shows that Mr. Larkin did little more than briefly consult with individuals at his place of employ; and he did not say who those individuals were, what information the Larkins provided to them, or what specific advice they supposedly gave. Moreover, Mr. Larkin clearly assumed the ultimate responsibility for the preparation of his returns. Because the Larkins have not met their burden to establish the relevant facts under Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98, we conclude that their return positions were a product of Mr. Larkin's decisions rather than those of informed tax counsel.

We find the Larkins neither had reasonable cause nor acted in good faith with regard to the positions they maintained on their returns. To the extent we sustain respondent's determinations, we also hold that the Larkins are liable for the accuracy-related penalties for 2009 and 2010.

[*73]                              Conclusion

The determinations in the IRS's SNOD are sustained in part, as explained

above.  So that the liabilities for the years at issue can be computed in light of this

opinion and of the parties' concessions,

<u>An appropriate order will be</u>

<u>issued, and decision will be entered</u>

<u>under Rule 155</u>.